## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Criminal Action No. 1:21-cr-277** |
| ) | |
| **ALIF JAN ADIL,** ) | |
| **Defendant.** ) | |

### MEMORANDUM OPINION

This is a criminal prosecution for: (i) abusive sexual contact, in violation of 18 U.S.C. § 2244(a) and § 7(3), (ii) coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and (iii) possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(A) and (b)(2). At issue now is Defendant's Motion to Suppress (Dkt. 15), which relates to statements that Defendant made to military police during an interview on November 8, 2021. Specifically, Defendant argues: (i) the statements were elicited in violation of *Miranda v. Arizona*[1] and *Missouri v. Seibert*[2] and (ii) the statements were the involuntary products of unlawful coercion. The parties fully briefed the matter and elicited testimony during an evidentiary hearing held on February 4, 2022. For the reasons stated in this Memorandum Opinion, Defendant's Motion to Suppress must be granted in part and denied in part.

### I.

During the course of the February 4 evidentiary hearing, witnesses described the details and circumstances of the interview of Defendant on November 8, 2021. On that date, Defendant, a national of Afghanistan, was housed at Camp Upshur, a temporary residence facility within Marine Corps Base Quantico for Afghan refugees. The Government presented the testimony of four

---

[1] 384 U.S. 436 (1966).

[2] 542 U.S. 600 (2004).

1

witnesses who were assigned to Camp Upshur and were present for or participated in the interview on November 8, 2021:

(1) Lieutenant Daniel Cliff, an active duty Marine Corps officer, served at that time in a military police capacity with the Provost Marshal's Office at Marine Corps Base Quantico. Lieutenant Cliff was the only commissioned officer present at the interview and questioned Defendant.

(2) Ahmad Harrif, an Immigration and Customs Enforcement ("ICE") employee, served as an ICE representative and liaison at Camp Upshur. Harrif, who speaks Pashto, served briefly as the initial interpreter at the beginning of Defendant's interview.

(3) Ahmad Sidique, a Department of Defense ("DOD") certified interpreter of Pashto, served as the second interpreter during the majority of Defendant's interview.

(4) Corporal Orion Duarte, U.S.M.C., read *Miranda* warnings in English to Defendant but did not otherwise participate in Defendant's interview.

The testimony elicited from these witnesses during the February 4 hearing was credible and established the following facts:

- In November 2021, Camp Upshur, located within the bounds of Marine Corps Base Quantico in Quantico, Virginia, housed a substantial number of Afghan refugees, including Defendant Alif Jan Adil. These refugees resided at Camp Upshur while awaiting resettlement within the United States. The refugee residents were free to leave and return to Marine Corps Base Quantico as they wished and were therefore referred to by the Marines as "travelers."

- Camp Upshur included a number of large residential tents, each housing more than a hundred refugees, as well as other facilities, including a medical center. Facilities for Marine Corp personnel were also present on the grounds of Camp Upshur, including a recreation room within a permanent building.

- On November 8, 2021, Ahmad Harrif was working on behalf of ICE as a "liaison officer and a lead culture advisor" at Camp Upshur. Dkt. 31 at 49. Harrif testified that, during his shift, a few of the camp's interpreters reported to him that an incident had occurred at one of the camp's residential tents.

- Harrif went to the tent where the incident was reported to have occurred and found a 14-year-old female resident named L.F., who was crying and speaking only in Pashto to an interpreter. Harrif, who was born in Peshawar, Pakistan and speaks Pashto fluently, was able to understand L.F.'s statement. According to Harrif, L.F., in essence, alleged that an adult male Camp Upshur resident, later identified as Defendant, had attempted to coerce L.F. to have sexual intercourse with him. L.F. reported that the adult male did so by threatening to post a lewd photograph of L.F. on social media.

- Immediately after hearing L.F.'s allegations, Harrif reported the allegations to Marine Corps Base Quantico's on-duty military police. Specifically, Harrif spoke with Lieutenant Daniel Cliff.

- After the conversation with Harrif, Lieutenant Cliff began an investigation into L.F.'s allegations. First, Lieutenant Cliff questioned L.F. at Camp Upshur's medical center through the Pashto interpretation of Harrif and a second interpreter, Farida Najeebi. In addition to the blackmail incident, L.F. reported to Lieutenant Cliff that the adult male resident had forcibly kissed her and inappropriately touched her. L.F. named Defendant Alif Adil as the perpetrator of these acts.

- Lieutenant Cliff then decided to locate Defendant in order to interview him regarding L.F.'s allegations. To that end, Lieutenant Cliff, along with Harrif, Corporal Orion Duarte, and two additional Marine corporals travelled to a residence tent for single males. There, with the aid of an Afghan resident named Omar who served as the village representative for that tent, Lieutenant Cliff located Defendant.

- Because Defendant speaks only Pashto and does not understand English, Lieutenant Cliff conversed with Defendant exclusively through interpreters. Lieutenant Cliff asked Defendant if he was willing to speak with the group, and Defendant agreed to do so. Lieutenant Cliff then asked Defendant to bring his identifying paperwork with him for the interview.

- At this point, Harrif told Defendant that the group wished to speak to Defendant about his resettlement case. Harrif testified that he did so because a group of curious camp residents had formed and Harrif was concerned that the allegations against Defendant could lead the residents to react adversely toward Defendant.

- For the purpose of the interview, Lieutenant Cliff selected a recreation room for Marine personnel. The recreation room, which was inside a permanent structure within Camp Upshur, was spacious and contained couches as well as a ping pong table and an air hockey table. The room was accessible through an exterior door which did not lock from the inside and was not locked during the interview.

- In addition to Lieutenant Cliff and Defendant, also present in the recreation room were ICE representative Harrif, Corporal Duarte, two additional Marine corporals, an additional interpreter who did not participate in the questioning, and village representative Omar. This group walked from the residence tent and arrived at the recreation at approximately 8:00 p.m.

- When Lieutenant Cliff began to question Defendant, Harrif served as the Pashto interpreter. Harrif was able to converse with Defendant in Pashto, although Harrif spoke a different dialect. The interview started with introductory identifying questions, such as Defendant's name and place of birth.

- Before provision of *Miranda* warnings, Lieutenant Cliff asked Defendant one or two

- preliminary substantive questions, which Lieutenant Cliff did not view as incriminating. Specifically, Lieutenant Cliff, through Harrif's translation, asked Defendant about the nature of his relationship with L.F. According to Harrif, Defendant described his relationship with L.F. using the Pashto word "mulgaree," which generally denotes platonic friendship but may connote a boyfriend-girlfriend relationship between a male and a female.

- Lieutenant Cliff testified that, after the "mulgaree" answer, he ordered Corporal Duarte to read *Miranda* warnings to Defendant. However, the record reflects that Lieutenant Cliff asked one additional question before ordering the provision of *Miranda* warnings. Specifically, Harrif recalled that Lieutenant Cliff also asked Defendant about an incident that had purportedly taken place the previous evening. Defendant responded that he had cuddled with L.F. under a blanket and had been discovered by L.F.'s mother.

- Following this question, Harrif testified that Lieutenant Cliff ordered Corporal Duarte to administer *Miranda* warnings to Defendant. Corporal Duarte complied, reading the warnings in English from a standard form, paragraph by paragraph, as Harrif translated each paragraph into Pashto for Defendant. Harrif testified that the *Miranda* form was not signed by Defendant at this time. Defendant was also placed into handcuffs around this time.

- After the first reading of the *Miranda* warnings, Lieutenant Cliff and ICE liaison Harrif asked Defendant a few additional questions. For example, Lieutenant Cliff asked Defendant whether Defendant had kissed L.F. Harrif also asked a question not posed by Lieutenant Cliff: "[H]ow would you feel, in an Islamic country, if the person that you are not married to and you are cuddling with somebody else's daughter, what if that was your daughter or your sister?" Dkt. 31 at 81. Harrif testified that Defendant appeared "remorseful and shameful" in response to this question. *Id.* at 82.

- At this point, Lieutenant Cliff halted questioning when he realized that Harrif did not hold valid credentials as a DOD-certified Pashto interpreter.[3] In order to be certain that Defendant fully understood the *Miranda* warnings, Lieutenant Cliff requested that a new, certified interpreter be located and sent to the recreation room promptly.

- Ahmad Sidique responded to Lieutenant Cliff's request for a new Pashto interpreter and arrived at the recreation room within approximately five minutes. On the evening of November 8, 2021, Sidique was working at Camp Upshur as an interpreter. Sidique, who was born and raised in Afghanistan, was certified by the DOD as a interpreter after passing proficiency exams in both English and Pashto.

- Upon Sidique's arrival, one of the Marines removed Defendant's handcuffs. Corporal Duarte then proceeded to readminister *Miranda* warnings to Defendant with Sidique's assistance. First, Corporal Duarte read each paragraph of the *Miranda* form aloud in English, and Sidique verbally translated each paragraph into Pashto for Defendant. Sidique then reviewed the form a second time with Defendant, at which time Defendant signed his initials next to each line on the form. Defendant then signed the *Miranda* form, which was

---

[3] Lieutenant Cliff testified that he understood that Harrif's credentials were simply out of date. By contrast, Harrif testified that he was never certified as a Pashto interpreter by the DOD.

- entered into the record at the evidentiary hearing as Exhibit 1. The form was marked as having been completed at 20:20 (*i.e.* 8:20 p.m.).

- Lieutenant Cliff testified that Defendant was calm and responsive throughout the interview. Sidique testified that Defendant seemed to be an intelligent individual and that Defendant appeared to understand the *Miranda* warnings as Sidique translated them.

- During the remainder of the interview, Lieutenant Cliff, through Sidique as the primary interpreter, continued to question Defendant about L.F.'s allegations. Defendant reiterated his statement about his "mulgaree" relationship with L.F. and his statement about cuddling with L.F. Defendant also admitted to kissing L.F. and touching L.F.'s breasts over her clothing.

- During this portion of the interview, Defendant also denied taking any photographs of L.F. or attempting to blackmail L.F. Lieutenant Cliff asked Defendant if he would consent to allow Lieutenant Cliff to view the contents of Defendant's cell phone to confirm Defendant's statement. Defendant consented to this request and opened his phone for Lieutenant Cliff.

- Sidique estimated that the interview concluded around 9:50 p.m. At that time, Defendant was arrested and transported to the Provost Marshal's Office for further processing.

- No evidence was offered or presented that Lieutenant Cliff intentionally conducted the interview in two stages for the purpose of undermining *Miranda*. To the contrary, the record reflects that the interview was conducted in two sessions simply because Lieutenant Cliff did not discover that Harrif did not possess valid DOD interpreter credentials until shortly after questioning began. The period after Sidique joined the group as the primary interpreter constituted a significantly longer portion of the interview.

## II.

Defendant contends that his statements during the November 8, 2021 interview must be suppressed for two reasons. First, Defendant argues that his interviewers engaged in an impermissible two-step interview strategy in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). Second, Defendant asserts that the circumstances of the interview were so coercive as to render Defendant's waiver of his *Miranda* rights and statements to interviewers involuntary.

### A.

Defendant's first argument—that the entire interview must be suppressed under *Missouri v. Siebert*—requires a clear a clear understanding of the authoritative holding of that case. In *Seibert*,

5

the record disclosed that police interviewers interrogated the defendant and elicited an unwarned confession, then provided *Miranda* warnings and again elicited the suspect's confession.[4] A majority of the Court held that the defendant's post-warning confession was inadmissible at trial. In a four-member plurality opinion, Justice Souter reasoned that, under the circumstances, the warnings could not "function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 601 (plurality) (citation omitted). Justice Kennedy provided a fifth vote for suppression, authoring a narrower concurrence which emphasized the fact that the police employed an interview strategy deliberately "designed to circumvent *Miranda*." *Id*. at 618 (Kennedy, J., concurring).

The Fourth Circuit has instructed that Justice Kennedy's concurrence "represents the holding of the *Seibert* Court." *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005). Justice Kennedy set forth a narrow test "applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). According to Justice Kennedy, if law enforcement interviewers did not deliberately seek to undermine *Miranda*, the analysis "should continue to be governed by the [voluntariness] principles" announced in an earlier case, *Oregon v. Elstad*.[5] *Id*. But when the record indicates that interviewers deliberately employed a two-step strategy to circumvent *Miranda*, the post-warning statements are inadmissible unless curative measures are employed to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id*. Potential curative measures include "a

---

[4] It is worth noting that the procedural safeguards set forth in *Miranda* apply when a defendant is subject to "custodial interrogation." 384 U.S. at 444. Here, as in *Seibert*, the parties agree that Defendant was in custody at the time he was interviewed on November 8, 2021. Accordingly, Defendant's interviewers were obligated to provide *Miranda* warnings.

[5] In *Oregon v. Elstad*, the Supreme Court held that incriminating statements offered after mid-interview *Miranda* warnings were admissible. 470 U.S. 298 (1985). The court concluded that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances *solely on whether it is knowingly and voluntarily made*." *Id*. at 309 (emphasis added). The *Elstad* Court rejected the contention that the post-warning statement was tainted by a "subtle form of lingering compulsion," namely "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." *Id*. at 311. As Justice Kennedy noted in *Seibert*, *Elstad* remains authoritative unless law enforcement interrogators deliberately employ the two-step procedure proscribed by *Seibert*.

substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" as well as modified *Miranda* warnings. *Id*.

The testimony in this case clearly compels the conclusion that Defendant's interviewers did not deliberately employ a two-step strategy to circumvent *Miranda*, and thus the admissibility of Defendant's statements is governed not by *Seibert* but instead by *Elstad*'s voluntariness framework. First, the limited nature of the pre-warning inquiry weighs heavily against a finding that Defendant's interviewers intentionally employed the tactic proscribed by *Seibert*. Importantly, the witnesses credibly testified that the interview of Defendant began chiefly with administrative identification questions. Lieutenant Cliff recalled asking just one substantive question before ordering the provision of *Miranda* warnings, namely a general query about the nature of Defendant's relationship with L.F. Harrif recalled that Lieutenant Cliff asked an additional question about Defendant's alleged inappropriate conduct toward L.F. the previous evening. To these questions, Defendant responded that he was in a friendly relationship with L.F., and that he had cuddled L.F. the prior evening. Defendant's most incriminating admissions, including that he had kissed L.F. and touched L.F.'s breasts, came *after* provision of *Miranda* warnings.

Put simply, these circumstances differ markedly from those at issue in *Siebert*. As the Supreme Court made clear, the police officers in *Seibert* conducted a comprehensive pre-warning interrogation after which "there was little, if anything, of incriminating potential left unsaid." *Seibert*, 542 U.S. at 616. Here, Defendant's interviewers asked, at most, two substantive questions prior to provision of *Miranda* warnings, and Defendant's incriminating admissions came only after Lieutenant Cliff ordered Corporal Duarte to *Mirandize* Defendant. Importantly, the Supreme Court has declined to apply *Seibert* to a case in which, although the defendant was subject to extensive pre-warning interrogation, the defendant did not make the relevant confession until after provision of *Miranda* warnings. *See Bobby v. Dixon*, 565 U.S. 23, 31 (2011). In other cases, the Fourth Circuit

7

has noted the brief nature of pre-warning questioning when declining to apply *Siebert*. *See, e.g.*, *Mashburn*, 406 F.3d at 305, 309–10 (applying the *Elstad* voluntariness framework where police officers remembered to provide Miranda warnings after only "approximately two to three" questions); *United States v. Dorsey*, 744 F. App'x 130, 134 (4th Cir. 2018) (noting that prewarning "questioning was brief" in finding *Seibert* inapplicable).

To continue, the evidentiary record also establishes that Lieutenant Cliff, far from deliberately seeking to undermine *Miranda*, was instead concerned with ensuring that Defendant was well-apprised of his *Miranda* rights. To be sure, the best practice on November 8, 2021 would have been to *Mirandize* Defendant before any substantive questioning. Nonetheless, Lieutenant Cliff credibly testified that he was trained in police interrogation and understood his obligations under *Miranda*, and that he ordered provision of warnings as soon as he realized the interview had taken an incriminating turn. Moreover, when Lieutenant Cliff realized that ICE liaison Harrif lacked valid DOD credentials as an interpreter, Lieutenant Cliff immediately summoned a replacement and again ordered provision of the warnings. In sum, there is simply no evidence in the record to support a conclusion that Lieutenant Cliff or his interview team deliberately employed a two-step technique in order to undermine *Miranda*.

Defendant's arguments to the contrary are not persuasive. First, Defendant does not appear to contend that Lieutenant Cliff intended to circumvent *Miranda*; instead, Defendant asserts that ICE liaison Harrif "took early control over the interrogation" and employed a *Seibert* two-step technique.[6] Dkt. 32 at 10. However, even assuming that Harrif's intent is relevant, Defendant's argument is squarely rebutted by the testimony elicited at the evidentiary hearing. Although Harrif

---

[6] It is worth emphasizing that, although Harrif apparently chose to ask one or a small number of additional questions of Defendant, Lieutenant Cliff was in charge and led the questioning of Defendant. Accordingly, it is Lieutenant Cliff's intent that is relevant to the *Siebert* inquiry. *See United States v. Stewart*, 536 F.3d 714, 722 (7th Cir. 2008) (relying on the intent of the lead investigator and noting that the *Siebert* analysis "does not require an inquiry into the state of mind of every officer involved in the interrogation").

did testify that he asked one or more questions not posed by Lieutenant Cliff, the context makes clear that Harrif's questions came *after* Harrif's reading of the *Miranda* warnings. *See* Dkt. 31 at 80–81. Defendant fails to cite any other evidence that Harrif, Lieutenant Cliff, or anyone else acted with an intent to circumvent *Miranda*. Additionally, Defendant's briefing relies on the *Siebert* plurality's rationale, namely that postwarning statements must be excluded if the mid-interview Miranda warnings could not "function effectively." *Seibert*, 542 U.S. at 611. However, as noted, the Fourth Circuit has made clear that Justice Kennedy's intent-based approach represents that binding holding of *Siebert*.

Accordingly, because the evidence clearly establishes that Defendant's interviewers did not intentionally employ a two-step strategy to circumvent *Miranda*, the admissibility of Defendant's statements are governed by the voluntariness framework of *Elstad*. Here, the record leaves no doubt that Defendant "knowingly and voluntarily" waived his rights under *Miranda*. *Elstad*, 410 U.S. at 309. First, as discussed *infra*, the record squarely rebuts Defendant's contention that his statements were the involuntary products of unlawful coercion. Second, there is no doubt that, by the time certified interpreter Sidique finished administering warnings to Defendant for a third time, Defendant had been well-apprised of his rights under *Miranda*.

In an effort to avoid this result, Defendant contends that the initial set of *Miranda* warnings, as translated by ICE liaison Harrif, were insufficient to advise Defendant adequately of his rights. Defendant notes, for example, that Harrif was not a certified interpreter, spoke a different dialect of Pashto than Defendant, and admitted that he did not translate the interview questions and answers verbatim. Defendant further asserts that other circumstances would have served to confuse Defendant, such as the fact that handcuffs were applied and removed after the first warning and that ICE liaison Harrif chose to ask questions that were not posed by Lieutenant Cliff. However, even assuming, *arguendo*, that Defendant is correct, Harrif's warning are not dispositive; it is instead the

9

subsequent warnings translated by Sidique which were adequate to dispel any confusion and to advise Defendant of his rights.

Importantly, it is clear that Sidique was well-equipped to translate English into Pashto for Defendant. Like Defendant, Sidique was born and raised in Afghanistan, and therefore spoke Pashto as a native language. Subsequently, Sidique was certified by the DOD as a interpreter, having passed proficiency exams in both English and Pashto, and was assigned to work at Camp Upshur as a Pashto interpreter. Additionally, Sidique orally administered Miranda warnings to Defendant as Corporal Duarte spoke them, and then reinforced the oral warnings by reviewing the *Miranda* form line-by-line with Defendant, as evidenced by Defendant's signed initials. Finally, Sidique credibly testified that he assessed Defendant to be an intelligent individual and that Defendant appeared to understand the *Miranda* warnings as he translated them. In light of this uncontroverted record evidence, it is apparent that Defendant "knowingly and voluntarily" waived his rights on November 8, 2021. *Elstad*, 410 U.S. at 309.

Accordingly, under the applicable framework in *Elstad*, any statements made by Defendant after Sidique's *Miranda* warnings are admissible at trial. However, any statements made before Sidique's warnings may not be elicited at trial. Specifically, because the parties agree that Defendant was in custody at the time of the interview, the Government may not introduce any statements offered by Defendant before the provision of any *Miranda* warnings. Additionally, because Harrif is not a certified Pashto interpreter, and it is not clear that Defendant fully understood the *Miranda* warnings as Harrif translated them, it is appropriate to exclude any answers given by Defendant after Harrif's warning but before Sidique's warnings.

**B.**

This does not end the analysis. Defendant also presents a second argument for suppression, namely that his *Miranda* waiver and statements were the involuntary products of unlawful coercion.

In order to weigh the voluntariness of a confession sought to be introduced at trial, a court must assess whether a defendant's "will has been overborne and his capacity for self-determination critically impaired." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (citing *Schneckloth v. Bustamante*, 412 U.S. 218, 225–26 (1973)). In turn, to assess whether a defendant's will was overborne, a court must analyze "the totality of the circumstances, taking into account characteristics of the accused, and details of the interrogation." *Id*. Relevant factors include: "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, and the use of physical punishment such as the deprivation of sleep." *Id*. For the purpose of this inquiry, the prosecution bears the burden to establish that a confession was voluntary by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972).

With respect to the voluntariness of Defendant's incriminating admissions, Defendant's primary contention is that he faced a coercive choice between speaking to his interviewers or suffering adverse immigration consequences. Defendant notes that, before Defendant was brought to the recreation room at Camp Upshur for the purpose of the interview, ICE liaison Harrif stated that "[w]e would like to talk about your resettlement case."[7] Dkt. 31 at 54. Defendant argues that Harrif's statement cast a coercive shadow over the subsequent interview. In this regard, Defendant relies on *United States v. Giddins*, 858 F.3d 870 (4th Cir. 2017). In *Giddins*, police interviewers threatened to retain the defendant's car indefinitely "if he failed to sign the *Miranda* waiver and answer their questions." *Id*. at 882. The interviewers also "affirmatively misled Giddins as to the true nature of the investigation by failing to inform him that he was the subject of the investigation." *Id.* at 884. Under those circumstances, the Fourth Circuit concluded that the defendant's *Miranda*

---

[7] Harrif testified that he made this statement in order to obscure the true purpose of the interview, namely to question Defendant about L.F.'s allegations, to protect Defendant. Specifically, Harrif stated that a substantial number of Camp Upshur residents had gathered, and Harrif was concerned that the nature of L.F.'s allegations could lead the residents to harm Defendant.

11

waiver was involuntary and that his confession was therefore inadmissible at trial.

Defendant's argument and analogy to *Giddins* are unpersuasive. Put simply, the facts of *Giddins* are readily distinguishable from those at issue here, and *Giddins* therefore does not govern the disposition of Defendant's Motion to Suppress. First, the animating principle of the *Giddins* decision is that the government may not threaten "substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Id*. at 882 (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977)). In this regard, during the course of the interview in *Giddins*, the interviewers repeatedly threatened to withhold the defendant's property if he declined to speak with them.

By contrast, no one in this case threatened that Defendant's exercise of his right to remain silent would result in a "substantial penalty." *Id*. ICE liaison Harrif's fleeting reference to Defendant's resettlement case, before Defendant's interview began, does not constitute such a threat. Neither Harrif nor anyone else involved in Defendant's interview stated or threatened that an immigration benefit would be withheld from Defendant if he declined to answer questions. As noted, in the interview room, Defendant received ample advisement of his rights through three readings of the standard *Miranda* warnings. Additionally, there was no mention of Defendant's immigration case in the interview room until after the questioning concluded. In sum, there is simply no evidence to support Defendant's contention that his will was overborne by a threat of adverse immigration consequences.

Further, it is also worth emphasizing that, unlike the interviewers in *Giddins*, Defendant's interviewers did not "affirmatively mis[lead Defendant] as to the true nature of the investigation." *Giddins*, 858 F.3d at 882. Instead, given the nature of the questions asked from the outset of the interview, it would have been readily apparent to Defendant that the subject of the interview was L.F.'s allegations against Defendant. Finally, to the extent that Harrif's earlier mention of

Defendant's resettlement case drew an implicit connection between that case and L.F.'s allegations against Defendant, it is important to note that frank discussion about the consequences of alleged criminal conduct does not constitute unlawful coercion. It is undeniably true that criminal conduct can give rise to adverse immigration consequences.[8] As the Fourth Circuit has made clear, discussion of potential consequences does not mandate exclusion of the suspect's interview responses. *See, e.g.*, *United States v. Braxton*, 112 F.3d 777, 783 (4th Cir. 1997) (interviewer's statement that the defendant "could face five years in jail was neither a threat that overpowered [the defendant's] will to resist, nor an implied promise that he could not refuse"); *Mashburn*, 406 F.3d at 310 (informing the defendant about "the gravity of his suspected offenses and the benefits of cooperation under the federal system" did not render his statements involuntary).

Taken as a whole, the "totality of the circumstances" of Defendant's interview clearly compel the conclusion that Defendant's *Miranda* waiver and statements were voluntarily given. *Abu Ali*, 528 F.3d at 232. For the purpose of this analysis, Defendant notes that he is a 24-year old Afghan refugee who speaks only Pashto, has no prior experience with the U.S. criminal justice system, and at the time of the interview was housed at a U.S. government facility and dependent on the government for subsistence. Although this is true, the record also makes clear that Lieutenant Cliff and Sidique took more than adequate steps to accommodate Defendant's status as an Afghan refugee and lack of experience with the U.S. justice system. To begin with, Defendant had the benefit of one or more Pashto interpreters during the entirety of his interaction with Lieutenant Cliff. And, throughout the bulk of the interview, Defendant could rely on Sidique, who was certified in Pashto interpretation by DOD and was also born and raised in Afghanistan. Further, Defendant received a total of three full *Miranda* warnings translated into Pashto first by Harrif and two additional times by Sidique. Finally, it also bears noting that the village representative for

---

[8] To offer one example, any alien who is convicted of a "particularly serious crime" is ineligible for asylum in the United States. 8 U.S.C. 1158(b)(2)(A)(ii).

13

Defendant's residence tent, Omar, was present during the interview of Defendant.

Other factors also support the conclusion that Defendant's agreement to speak with military police on November 8, 2021 was voluntary. First, the interview was conducted in a comfortable environment. Specifically, Lieutenant Cliff chose to interview Defendant in a recreation room which was large, furnished with couches and game implements, and accessible through an exterior door which was not locked from the inside. Second, nothing indicates that Lieutenant Cliff or anyone else elicited Defendant's answers through force, the threat of force, or any other coercive tactics. The fact that Defendant was in custody, and briefly placed into handcuffs, does not alter this analysis. No authority bars police from interviewing suspects who have been handcuffed and taken into custody. Rather, police interviewers undertaking a custodial interrogation must simply abide by the dictates of *Miranda*, which Lieutenant Cliff, with the aid of interpreter Sidique, did in this case.

Finally, and most importantly, Defendant's conduct during the interview underscores the fact that Defendant's interview answers were the product of free choice. At the evidentiary hearing, Lieutenant Cliff credibly testified that Defendant's demeanor was "calm" and "responsive" throughout the duration of the interview. Dkt. 31 at 26. Lieutenant Cliff's assessment is supported by Defendant's interview answers. Although Defendant admitted to some of L.F.'s allegations, such as that he kissed L.F. and touched L.F. inappropriately, Defendant felt free to deny other allegations. For example, Defendant contested the allegation that he had attempted to blackmail L.F., and agreed to show Lieutenant Cliff his phone's camera roll in order to prove that he did not possess any lewd photographs of L.F. The fact that Defendant admitted to some conduct and denied other allegations emphasizes the fact that Defendant felt free to choose what to say during the interview.

In sum, a careful review of the testimony presented regarding the circumstances of Defendant's interview on November 8, 2021 makes clear that Defendant's will was not

"overborne," nor was Defendant's "capacity for self-determination critically impaired." *Abu Ali*, 528 F.3d at 232. Accordingly, the Government has satisfied its burden to prove, by a preponderance of the evidence, that the incriminating statements that it intends to introduce at trial were voluntarily made by Defendant.[9]

### III.

In summary, the evidentiary record makes clear that *Seibert* is inapplicable to this case, as neither Lieutenant Cliff nor anyone else involved in Defendant's November 8, 2021 interview intentionally delayed provision of warnings in order to circumvent *Miranda*. Thus, Defendant's statements are admissible to the extent that his *Miranda* waiver was "knowingly and voluntarily made." 470 U.S. at 309. As noted, the record squarely rebuts Defendant's contention that his statements were involuntary. And the record further makes clear that Defendant was well-apprised of his *Miranda* rights, and in position to give a knowing waiver, by the time he received a second and third recitation of the warnings by interpreter Sidique.

Accordingly, Defendant's Motion to Suppress must be granted in part and denied in part. Specifically, the Government may not introduce at trial any statements made by Defendant *before* Sidique's translation of the *Miranda* warnings, but may introduce any statements that Defendant made *after* Sidique's translation of the *Miranda* warnings. An appropriate Order will issue separately.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, VA
June 14, 2022

/s/ T. S. Ellis, III
United States District Judge

---

[9] It is worth noting that this ruling does not bar Defendant from presenting a voluntariness argument to the jury. Defendant is free to argue to the jury that his admissions were the involuntary products of coercion and are, accordingly, entitled to little or no weight in the jury's consideration.